**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

THOMAS E. HORNISH AND SUZANNE J. HORNISH JOINT LIVING TRUST; TRACY NEIGHBORS; BARBARA NEIGHBORS; ARUL MENEZES; LUCRETIA VANDERWENDE; HERBERT MOORE; ELYNNE MOORE; EUGENE MOREL; ELIZABETH MOREL; LAKE SAMMAMISH 4257 LLC,
            *Plaintiffs-Appellants*,

                    v.

KING COUNTY, a home rule charter county,
            *Defendant-Appellee.*

No. 16-35486

D.C. No.
2:15-cv-00284-MJP

OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, Senior District Judge, Presiding

Argued and Submitted June 14, 2018
Seattle, Washington

Filed August 3, 2018

Before:  MILAN D. SMITH, JR. and PAUL J.
WATFORD, Circuit Judges, and DOUGLAS L. RAYES,[*]
District Judge.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[**]

### Property Law

The panel affirmed the district court's summary judgment in favor of King County, Washington, quieting title to a rail corridor that the Surface Transportation Board had "railbanked" pursuant to the Trails Act.

The panel held that the action arose under federal law, and the panel had jurisdiction pursuant to 28 U.S.C. § 1331, because the plaintiffs' state law claim necessarily raised a federal issue that was actually disputed, substantial, and capable of resolution in federal court without disrupting any congressionally approved federal-state balance.

The panel held that the plaintiffs, landowners whose properties abutted the rail corridor's boundaries, lacked both Article III and statutory standing to bring their claim for a declaratory judgment pursuant to Wash. Rev. Code § 7.24.020 because they lacked any property interests in the

---

[*] The Honorable Douglas L. Rayes, United States District Judge for the District of Arizona, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

corridor. The panel concluded that the County owned one portion of the corridor in fee. In addition, the Trails Act preserved the railroad easement and created a new easement for trail use, and both easements were conveyed to King County. The panel concluded that Washington's "centerline presumption" did not apply.

The panel held that the district court properly granted summary judgment to and quieted title in King County because the county possessed the railroad easement and the recreational easement. The panel concluded that the easement was 100 feet wide, with certain exceptions. The panel denied plaintiffs' motion to supplement the record with new evidence regarding the width of the corridor.

## COUNSEL

Steven Wald (argued), Stewart Wald & McCulley LLC, St. Louis, Missouri; Thomas S. Stewart and Elizabeth Gepford McCulley, Stewart Wald & McCulley LLC, Kansas City, Missouri; for Plaintiffs-Appellants.

David J. Hackett (argued), King County Prosecuting Attorney's Office, Seattle, Washington; Mallory L.B. Satre and Emily J. Harris, Corr Cronin Michelson Baumgardner Fogg & Moore LLP, Seattle, Washington; for Defendant-Appellee.

Patrick J. Schneider, Philip E. Paine, and Beth A. Clark, Foster Pepper PLLC, Seattle, Washington, for Amicus Curise BNSF Railway Company.

James E. Breitenbucher, Riddell Williams P.S., Seattle, Washington, for Amicus Curiae Puget Sound Energy Inc.

Mark C. Zebrowski, Morrison & Foerster LLP, San Diego, California; David P. Thoreson, Morrison & Foerster LLP, San Francisco, California; Andrea Foster, General Counsel, Rails to Trails Conservancy Inc., Washington, D.C.; for Amicus Curiae Rails to Trails Conservancy.

Richard M. Stephens, Stephens & Klinge LLP, Bellevue, Washington, for Amicus Curiae Sammamish Home Owners.

## OPINION

M. SMITH, Circuit Judge:

After the Surface Transportation Board (the STB) "railbanked" the portions of the Eastside Rail Corridor (the Corridor) adjacent to or bisecting Plaintiffs-Appellants' residential lots, pursuant to the National Trails System Act Amendments of 1983 (the Trails Act), 16 U.S.C. § 1247 *et seq.*, Plaintiffs-Appellants filed suit in federal court seeking a declaration of their property rights in the Corridor. Plaintiffs-Appellants disputed the nature and scope of Defendant-Appellee King County's railroad easement, and the Corridor's width. In response, King County filed counterclaims asking the court to (1) declare that the Trails Act preserved the full scope of the original railroad easement, and that the Corridor's width is 100 feet, and (2) quiet title to the Corridor in King County. Both sides moved for summary judgment. The district court denied summary judgment to Plaintiffs-Appellants, dismissed their claims with prejudice, and granted summary judgment to, and quieted title to the Corridor in, King County. Plaintiffs-Appellants timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Origins of the Corridor & Plaintiffs-Appellants' Property Interests

In 1887, the Seattle, Lake Shore & Eastern Railway Company (SLS&E), which later became part of BNSF Railway Company (BNSF, and together with SLS&E, the Railroad), began to construct the Corridor along the eastern shoreline of Lake Sammamish. The SLS&E obtained the land that it needed for the Corridor through various means, which gave the SLS&E a collection of railroad easements and fee simple properties. *See Beres v. United States*, 104 Fed. Cl. 408, 412 (2012) (hereinafter *Beres III*).

All Plaintiffs-Appellants are landowners whose properties abut the Corridor's boundaries (the precise location of which the parties dispute). Plaintiff-Appellant the Thomas E. Hornish and Suzanne J. Hornish Joint Living Trust (Plaintiff-Appellant Hornish) owns property adjacent to a portion of the Corridor that SLS&E obtained through a May 9, 1887 quitclaim deed executed by homesteader William Hilchkanum and his wife. Hilchkanum later sold the remainder of his property, and some part of that remainder interest is now owned by Plaintiff-Appellant Hornish.

Plaintiffs-Appellants Tracy and Barbara Neighbors, Arul Menezes and Lucretia Vanderwende, Lake Sammamish 4257 LLC, Herbert and Elynne Moore, and Eugene and Elizabeth Morel (the Non-Hornish Plaintiffs-Appellants) own properties that are adjacent to other portions of the Corridor. The SLS&E completed construction of the Corridor's tracks in March 1888, and the Northern Pacific Railroad conveyed its property to Samuel Middleton the

following year.    The Non-Hornish Plaintiffs-Appellants'
chains of title all originate with Middleton.

## II.  The Railbanking Process

In 1997, BNSF conveyed all of its ownership interests in
the Corridor to The Land Conservancy of Seattle and King
County (TLC) through a recorded quitclaim deed.  On June
11, 1997, TLC initiated the "railbanking" process by
petitioning the STB for an exemption to allow TLC's
abandonment of the Corridor for active rail service.  *See
Land Conservancy of Seattle & King Cty.-Abandonment
Exemption-in King Cty., WA*, No. AB-508X, 1997 WL
359085, at \*1 (S.T.B. June 23, 1997).  As part of its petition,
TLC provided King County's Statement of Willingness to
Assume Financial Responsibility as the interim trail sponsor
under the Trails Act.  *Burlington N. & Santa Fe Ry. Co.-
Abandonment Exemption-in King Cty., Wa*, No. AB-6 (Sub-
No. 380X), 1998 WL 638432, at \*1 (S.T.B. Sept. 16, 1998).
The STB granted the exemption on May 13, 1998.  Then, in
September of 1998, the STB issued a Notice of Interim Trail
Use (NITU) to facilitate railbanking and interim trail use.

Subsequently, TLC and King County entered into an
agreement formally designating King County as the trail
sponsor.  The agreement also conveyed to King County all
of TLC's ownership interests in the Corridor through a
recorded quitclaim deed, which described the precise
property that was being conveyed.  King County then
constructed a soft-surface hiking and biking trail in the
Corridor.  More recently, King County has prepared to
construct a paved trail.

## III.     Prior Proceedings

On February 25, 2015, several of Plaintiffs-Appellants, among others, filed suit to obtain a declaration of their rights with regard to the Corridor and to quiet their title in the Corridor.  King County moved to dismiss the complaint for lack of standing, arguing that the Plaintiffs-Appellants had failed to demonstrate that they had any ownership interest in the Corridor.  While this motion was pending, the Plaintiffs-Appellants sought leave to file a proposed amended complaint.

On June 5, 2015, the district court granted King County's motion to dismiss, and denied leave to file the proposed amended complaint.  The court determined that amendment would be futile because the proposed amended complaint did not remedy the standing defects of the original complaint.  However, the court gave the Plaintiffs-Appellants leave to file a different amended complaint that would address the standing problem.  Plaintiffs-Appellants did so, filing the Amended Complaint (AC).  King County then answered and brought quiet title and declaratory judgment counterclaims.

Both sides then filed motions for summary judgment. On April 20, 2016, the district court denied Plaintiffs-Appellants' summary judgment motion, dismissed Plaintiffs-Appellants' claims with prejudice, and granted summary judgment to King County with regard to its declaratory judgment and quiet title counterclaims. Plaintiffs-Appellants timely appealed.

## STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*.  *King County v. Rasmussen*, 299 F.3d 1077, 1083 (9th Cir. 2002).  We "must determine, viewing

the evidence in the light most favorable to the nonmoving party, whether there are any genuine [disputes] of material fact and whether the district court correctly applied the relevant substantive law. All reasonable inferences from the evidence must be drawn in favor of the nonmoving party." *Id.* (citation omitted).

## JURISDICTION

We have jurisdiction pursuant to 28 U.S.C. § 1331. 28 U.S.C. § 1331 authorizes federal jurisdiction over all civil actions "arising under" federal law. The Supreme Court "has found that statutory term satisfied in either of two circumstances. Most directly, and most often, federal jurisdiction attaches when federal law creates the cause of action asserted." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562, 1569 (2016). The parties agree that such is not the case here. However, "even when 'a claim finds its origins' in state law, there is 'a special and small category of cases in which arising under jurisdiction still lies.'" *Id.* (quoting *Gunn v. Minton*, 568 U.S. 251, 258 (2013)). This case falls within the latter category.

As the Supreme Court has explained, "a federal court has jurisdiction of a state-law claim if it 'necessarily raises a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance' of federal and state power." *Manning*, 136 S. Ct. at 1570 (alteration omitted) (quoting *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005)). "That is, federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. Jurisdiction is proper

"[w]here all four of these requirements are met" because in such a case, "there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting Congress's intended division of labor between state and federal courts." *Id.* (quoting *Grable*, 545 U.S. at 313). The Supreme Court "ha[s] often held that a case 'arose under' federal law"— meeting these criteria—"where the vindication of a right under state law necessarily turned on some construction of federal law." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9 (1983) (citing *Smith v. Kansas City Title & Tr. Co.*, 255 U.S. 180 (1921); *Hopkins v. Walker*, 244 U.S. 486 (1917)); *see also* 14B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3722 (4th ed. 2016) ("An important corollary to the well-pleaded complaint rule is that the essential federal element of the plaintiff's complaint must be supported under one construction of federal law and defeated under another.").

Plaintiffs-Appellants argue that the federal courts lack jurisdiction because a Trails Act issue arises only as a defense. They liken this case to *Shulthis v. McDougal*, 225 U.S. 561 (1912), wherein the Court held that it had no jurisdiction over a quiet title action simply because one party had "derived his title under an act of Congress." *Id.* at 570. Plaintiffs-Appellants also posit that this case is distinguishable from *Rasmussen* because there, King County was the plaintiff alleging that its rights derived from federal law, 299 F.3d at 1082, while here, King County is a defendant and its assertion of rights under federal law arises only as a defense. Finally, Plaintiffs-Appellants argue that the Trails Act's application is not "actually disputed."

These attempts to recharacterize the AC's plain invocation of the Trails Act fail. Certainly, we agree with Plaintiffs-Appellants that our jurisdictional analysis is limited by "the longstanding well-pleaded complaint rule," which provides that "a suit 'arises under' federal law 'only when the plaintiff's statement of his own cause of action shows that it is based upon federal law,'" and which does not permit a finding of jurisdiction "predicated on an actual or anticipated defense," or "upon an actual or anticipated counterclaim." *Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009) (alteration omitted) (quoting *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908)). We disagree, however, that federal claims in this case arise only from Defendants-Appellees' defenses and counterclaims.

*Grable* itself is instructive in this regard. There, the plaintiff had filed a quiet title action in Michigan state court, alleging that it had superior title to certain real property that had been seized by the Internal Revenue Service (IRS) because the IRS had failed to give the plaintiff notice of the seizure, as required by a federal tax statute. *Grable*, 545 U.S. at 311. The defendant had then "removed the case to Federal District Court as presenting a federal question, because the claim of title depended on the interpretation of the notice statute in the federal tax law." *Id.* The Supreme Court affirmed that the "case warrant[ed] federal jurisdiction." *Id.* at 314. The Court held that because the plaintiff had "premised its superior title claim on a failure by the IRS to give it adequate notice, as defined by federal law," the question of whether the plaintiff had been "given notice within the meaning of the federal statute" was necessarily raised as "an essential element of [the plaintiff's] quiet title claim." *Id.* at 314–15. Additionally, "the meaning of the federal statute [was] actually in dispute," because it was "the only legal or factual issue contested in the case," and "an

important issue of federal law that sensibly belongs in a federal court." *Id.* at 315. Finally, the Court explained that "because it [would] be the rare state title case that raises a contested matter of federal law, federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor." *Id.*

## A. Requirements One and Two

Applying *Grable*'s reasoning to this case, we hold that we have jurisdiction. We note that a federal issue is both "necessarily raised" on the face of the AC, and "actually disputed" by the parties. As described above, Plaintiffs-Appellants have alleged one claim in the AC: Pursuant to Revised Code of Washington section 7.24.020,[1] Plaintiffs-Appellants seek "a declaration of rights that the original source conveyance to the railroad was an easement and other interests acquired by the railroad were prescriptive easements, that the easements were for railroad purposes only, and that Plaintiffs-Appellants are the fee owners of the railroad right-of-way at issue, and King County only acquired a surface easement for a hiking and biking trail with the possible reactivation of a railroad pursuant to the Trails Act."

Thus, Plaintiffs-Appellants have petitioned us to answer at least one "question of construction or validity," Wash.

---

[1] This section provides that "[a] person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder." Wash. Rev. Code § 7.24.020.

Rev. Code § 7.24.020, that necessarily implicates the Trails Act:  Specifically, they have asked us to declare that "King County only acquired a surface easement for a hiking and biking trail with the possible reactivation of a railroad pursuant to the Trails Act."    This petition relies on allegations (1) that "[t]he Trails Act authorizes the STB to preserve railroad corridors or rights-of-way not currently in use for train service for possible future rail use by converting those rights-of-way into recreational trails," and (2) that "King County, through the Quit Claim Deed from BNSF, acquired an easement over the surface of the right-of-way which, pursuant to the Trails Act, is now an easement for a hiking and biking trail with the possible reactivation of a railroad."  Defendants-Appellees dispute these facts, arguing that King County acquired a full railway easement through the Quit Claim Deed, which encompasses far more than a surface right of-way.  The resolution of this dispute turns on an interpretation of the Trails Act, because deciding the scope of King County's rights pursuant to the Quit Claim Deed will require this court to determine whether the Trails Act creates, supplements, or replaces any previously existing railroad easement.    In other words, "the vindication of [Plaintiffs-Appellants'] right[s] under state law necessarily turn[s] on some construction of federal law."  *Franchise Tax Bd.*, 463 U.S. at 9.  Thus, the first two *Grable* requirements are satisfied in this case.  *See Gunn*, 568 U.S. at 258.

## B.  Requirements Three and Four

*Grable*'s latter two requirements are also satisfied:  The federal issue is both "substantial" and "capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Id.*  For an issue to be "substantial," "it is not enough that the federal issue be significant to the particular parties in the immediate suit  . . . .  The

substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal system as a whole." *Id*. at 260.  In *Grable*, for example, the Court "emphasized the Government's 'strong interest' in being able to recover delinquent taxes through seizure and sale of property, which in turn 'required clear terms of notice to allow buyers to satisfy themselves that the Service has touched the bases necessary for good title'" and then found that the "Government's 'direct interest in the availability of a federal forum to vindicate its own administrative action' made the question 'an important issue of federal law that sensibly belonged in a federal court.'"  *Id.* at 260–61 (alterations omitted) (quoting *Grable*, 545 U.S. at 315).

The Supreme Court has already spoken regarding the importance of the Trails Act, and the federal-state balance it struck.    The Court has deemed the Trails Act "the culmination of congressional efforts to preserve shrinking rail trackage by converting unused rights-of-way to recreational trails." *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 5 (1990) (hereinafter *Preseault I*).  The Court noted that "[t]wo congressional purposes [were] evident" with regard to the Trails Act.  *Id.* at 17.  On the one hand, "Congress intended to 'encourage the development of additional trails' and to 'assist recreational users by providing opportunities for trail use on an interim basis.'" *Id.* (alteration omitted) (quoting H.R. Rep. No. 98-28, at 8–9 (1983); S. Rep. No. 98-1, at 9–10 (1983) (same)); *see also* 16 U.S.C. § 1241(a) ("[The Trails Act] promote[s] the preservation of, public access to, travel within, and enjoyment and appreciation of the open-air, outdoor areas and historic resources of the Nation . . . .").  On the other hand, Congress also "intended 'to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage

energy efficient transportation use.'" *Preseault I*, 494 U.S. at 18 (quoting H.R. Rep. No. 98-28, at 8; S. Rep. No. 98-1, at 9); *see also* 16 U.S.C. § 1247(d). "[E]ven if no future rail use for [a rail corridor] is currently foreseeable," Congress determined "that every line is a potentially valuable national asset that merits preservation." *Preseault I*, 494 U.S. at 19.

Thus, the Government has a strong interest in both facilitating trail development and preserving established railroad rights-of-way for future reactivation of rail service. And, because Congress acted in the Trails Act to preclude the operation of state laws regarding abandonment, and placed supervision of the "railbanking" and reactivation processes in the hands of the STB, *see* 16 U.S.C. § 1247(d); 49 U.S.C. § 10501(b) (express preemption of state abandonment regulation); 49 U.S.C. § 10903 (STB authority over abandonment), the Government also has a "direct interest in the availability of a federal forum to vindicate its own administrative action," such that the scope of the Trails Act is "an important issue of federal law that sensibly belongs in a federal court." *Grable*, 545 U.S. at 315. We therefore conclude that we have jurisdiction because this case satisfies all four *Grable* requirements.[2]

---

[2] We note that our jurisdiction is also supported by our court's precedents regarding declaratory judgment claims. In a line of cases beginning with *Janakes v. United States Postal Service*, 768 F.2d 1091 (9th Cir. 1985), we have adhered to the rule that if "the declaratory judgment defendant could have brought a coercive action in federal court to enforce its rights, then [the court has] jurisdiction," so long as that coercive action would "arise under" federal law. *Id.* at 1093; *see also, e.g.*, *Chevron U.S.A. Inc. v. M & M Petroleum Servs., Inc.*, 658 F.3d 948, 951 (9th Cir. 2011); *Standard Ins. Co. v. Saklad*, 127 F.3d 1179, 1181 (9th Cir. 1997) ("A person may seek declaratory relief in federal court if the one against whom he brings his action could have asserted his own

## ANALYSIS

Because the parties filed cross motions for summary judgment, we will consider each motion in turn.  First, we will review the district court's denial of summary judgment to Plaintiffs-Appellants and dismissal of the AC for lack of standing.  We will then consider the merits of Defendants-Appellees' motion.

## I.  Plaintiffs-Appellants Lack Standing

As noted, Plaintiffs-Appellants' AC seeks a declaratory judgment pursuant to Revised Code of Washington section 7.24.020.  The district court found that Plaintiffs-Appellants lacked both Article III and statutory standing to bring this claim, and we agree.

These standing inquiries overlap.  "A plaintiff seeking relief in federal court must establish the three elements that constitute the 'irreducible constitutional minimum' of Article III standing . . . ." *Friends of Santa Clara River v.*

rights there.").  "In other words, in a sense [the court] can reposition the parties in a declaratory relief action by asking whether [it] would have jurisdiction had the declaratory relief defendant been a plaintiff seeking a federal remedy."  *Standard Ins. Co.*, 127 F.3d at 1181.  Here, we already have had the opportunity to address the propriety of jurisdiction in a coercive action brought by Defendants-Appellees.  In *Rasmussen*, King County *was* the plaintiff and had alleged "that it had a legal right to the strip of land in question even if the original deed conveyed only an easement" because of 16 U.S.C. § 1247(d).  299 F.3d at 1082.  We held that "there was a federal question on the face of the well-pleaded complaint," such that the court had jurisdiction to hear the case.  *Id.* Thus, we have jurisdiction over the instant case on the alternative ground that we "would have jurisdiction had the declaratory relief defendant been a plaintiff seeking a federal remedy."  *Standard Ins. Co.*, 127 F.3d at 1181.

*U.S. Army Corps of Eng'rs*, 887 F.3d 906, 918 (9th Cir. 2018) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Specifically, the plaintiff must show

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1141 (9th Cir. 2010) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

Similarly, to have standing to sue under Section 7.24.020, a plaintiff must show there is a "justiciable controversy."  *To-Ro Trade Shows v. Collins*, 27 P.3d 1149, 1153 (Wash. 2001).  Washington courts have

> defined a justiciable controversy as "(1) an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive."

*Id.* (alteration omitted) (quoting *Diversified Indus. Dev. Corp. v. Ripley*, 514 P.2d 137, 139 (Wash. 1973)).  "Inherent

in these four requirements are the traditional limiting doctrines of standing, mootness, and ripeness, as well as the federal case-or-controversy requirement." *Id*.; *see also Five Corners Family Farmers v. State*, 268 P.3d 892, 896 n.2 (Wash. 2011) (noting that "justiciable controversy" requirements overlap with requirements for standing). In particular, the "third justiciability requirement of a direct, substantial interest in the dispute encompasses the doctrine of standing," which requires a party to "show, in addition to 'sufficient factual injury,' that 'the interest sought to be protected is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *To-Ro Trade Shows*, 27 P.3d at 1154–55 (alteration omitted) (quoting *Seattle Sch. Dist. No. 1 v. State*, 585 P.2d 71, 82 (Wash. 1978)).

Thus, to have Article III and statutory standing to challenge King County's interest in the Corridor, Plaintiffs-Appellants must show that Defendants-Appellees' possession or use of the Corridor injured Plaintiffs-Appellants' interests therein. Because we find for the reasons following that Plaintiffs-Appellants have no property interests in the Corridor, we hold that they cannot allege any injury to such interests, and therefore lack standing.

## A. The County Owns the Portion of the Corridor Adjacent to the Hornish Property in Fee

The parties do not dispute the contents of the Hilchkanum deed, from which the Hornish property is derived. Rather, they dispute whether the deed conveyed a railroad right of way in fee simple or through an easement.

This question has already been resolved by our court. In *Rasmussen*, we held that the Hilchkanum deed conveyed to

the railroad a fee simple interest in the "right of way strip." 299 F.3d at 1080, 1088.  We analyzed the deed with regard to the factors outlined in *Brown v. State*, 924 P.2d 908, 911 (Wash. 1996), and found them to confirm that the deed's language and the contracting parties' behavior evinced an intent to convey a fee simple interest. *Rasmussen*, 299 F.3d at 1084–88.

Subsequently, an intermediary Washington court found the same.  In *Ray v. King County*, 86 P.3d 183 (Wash. Ct. App. 2004), the Washington Court of Appeals confirmed that its analysis of the *Brown* factors "demonstrate[d] that Hilchkanum conveyed the right of way to the Railway in fee, not as an easement." *Id.* at 192.  The Washington Supreme Court declined review. *Ray v. King County*, 101 P.3d 421 (2004).

We are bound by these decisions.  The *Rasmussen* panel's analysis of the Hilchkanum deed was central to its affirmance of the district court's grant of summary judgment to King County, *see Rasmussen*, 299 F.3d at 1088 (holding that because the deed conveyed property in fee simple, "King County, as the Railway's successor, possesse[d] a fee simple in the strip of land," and the district court was affirmed), and  we "treat reasoning central to a panel's decision as binding later panels," *Garcia v. Holder*, 621 F.3d 906, 911 (9th Cir. 2010) (quoting *Sanchez v. Mukasey*, 521 F.3d 1106, 1110 (9th Cir. 2008)).  Moreover, "[i]n the absence of any decision on this issue from the [Washington] Supreme Court, we are bound by [*Ray*], as the ruling of the highest state court issued to date." *Poublon v. C.H.*

*Robinson Co.*, 846 F.3d 1251, 1266 (9th Cir. 2017) (citing *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940)).[3]

Plaintiffs-Appellants argue that these decisions are no longer good law because they rely on *Brown*, which created a multifactor test that the Washington Supreme Court subsequently modified in *Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Lines Association*, 126 P.3d 16, 25–26 (Wash. 2006). Plaintiffs-Appellants note that the only court to have analyzed the Hilchkanum deed after *Kershaw*, the U.S. Court of Federal Claims, held that *Rasmussen* and *Ray* were wrongly decided in light of *Kershaw*, and that the Hilchkanum deed conveyed only an easement to the railroad. *See Beres III*, 104 Fed. Cl. at 424–32; *Beres v. United States*, 97 Fed. Cl. 757, 784–92 (2011) (hereinafter *Beres II*).

However, the Washington Supreme Court itself has demonstrated a belief that *Kershaw* did not "undercut the theory or reasoning" underlying *Rasmussen* and *Ray* "in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). First, in *Kershaw* itself, the court affirmed the correctness of *Ray*. The court noted that "while the [Hilchkanum] deed did include the phrase 'right of way' it did so only to the extent that it stated it was conveying a 'right of way strip.' The *Ray* court thus found no presumption in favor of an easement and applied the *Brown* factors to reach its conclusion that a fee interest was transferred." *Kershaw*, 126 P.3d at 25 n.11. This, the *Kershaw* court continued, distinguished the

---

[3] Defendants-Appellees suggest that "this is particularly true where, as in *Ray*, the Washington Supreme Court has denied review." However, the authority that they cite for this proposition, *Intex Plastics Sales Co. v. United Nat'l Ins. Co.*, 23 F.3d 254, 257 n.1 (9th Cir. 1994), is no longer good law in this circuit, *see Ajir v. Exxon Corp.*, 185 F.3d 865 n.3 (9th Cir. 1999) (mem.).

Hilchkanum deed from the deed at issue in *Kershaw*, which "specifically established the *purpose* of the grant when it stated the land was 'to be used by the Railway as a right of way for a railway'" and thereby created "a presumption in favor of an easement which was not present in *Ray*." *Id.* (alteration omitted). Second, the Washington Supreme Court declined the U.S. Court of Claims' certification request seeking clarification of *Brown*'s application, on the basis that no clarity was lacking. Rather, the court was "of the view that, in light of existing precedent such as *Brown v. State*, 924 P.2d 908 (Wash. 1996) and *Ray v. King County*, 86 P.3d 183, *review denied*, 101 P.3d 421 (Wash. 2004), the questions posed by the federal court are not 'questions of state law which have not been clearly determined.'" *Beres v. United States*, 92 Fed. Cl. 737, 746 (2010) (hereinafter *Beres I*) (alterations omitted); *see also Beres II*, 97 Fed. Cl. at 786. This is persuasive evidence that the Washington Supreme Court believes *Kershaw* created no "clearly irreconcilable" conflict with *Ray*.

Moreover, even if *Kershaw* did modify the relevant analytical method, we would be unable to reach a different result than we did in *Rasmussen*. *Kershaw* specifies that a presumption in favor of an easement is created when a deed "uses the term 'right of way' as a limitation or to define the purpose of the grant, [which] operates to 'clearly and expressly limit or qualify the interest conveyed.'" *Kershaw*, 126 P.3d at 22 (alterations omitted) (quoting *Brown*, 924 P.2d at 912); *see also Beres II*, 97 Fed. Cl. at 785. The *Beres* court found that the Hilchkanum deed had used the "right of way" language in this way in its granting clause, such that the *Kershaw* easement presumption applied. *Beres III*, 104 Fed. Cl. at 430; *Beres II*, 97 Fed. Cl. at 785.

But our court and the *Ray* court found differently.  In *Rasmussen*, we characterized the granting clause language that the *Beres* court deemed limiting under *Kershaw*—evincing the parties' expectation "that the right of way would be used to construct and operate a railroad"—as mere "precatory language" that "did not actually condition the conveyance on such use."  299 F.3d at 1086.  And, in *Kershaw*, the Washington Supreme Court noted that the deed then before it "specifically established the purpose of the grant when it stated the land was 'to be used by [the Railway] as a right of way for a railway'" and thereby created "a presumption in favor of an easement *which was not present in* Ray."  126 P.3d at 25 n.11 (alteration in original) (emphasis added).  We are bound by this reasoning.  Thus, we must hold that the "right of way" language in the granting clause is not limiting, and does not give rise to the *Kershaw* easement presumption.  This leads us to hold that King County owns the portion of the Corridor adjacent to the Plaintiff-Appellant Hornish's property in fee, and that Plaintiff-Appellant Hornish has no property interest therein.

## B. The Trails Act Preserved the Railroad Easement and Created a New Easement for Trail Use, Both of Which Were Conveyed to King County

The parties agree that because no original deeds were introduced into evidence for the portions of the Corridor adjacent to which the Non-Hornish Plaintiffs-Appellants own land, the railroad possesses a prescriptive easement with regard to those portions.  The parties disagree, however, as to the current status of that easement.  Plaintiffs-Appellants argue that when the Corridor was railbanked, "the railroad purposes easement [was] converted to a new 'railbanked' easement/trail easement that replaces the former railroad purposes easement with a new trail easement

with the potential reactivation of the railroad easement." The railroad easement is converted into a "new hiking and biking trail/railbanked easement." Defendants-Appellees reject this explanation and contend that "the Trails Act merely preempts abandonment of the state law easement and guarantees the right to trail use" by its plain language. In other words, the Trails Act preserves—rather than converts—the existing railroad easement, and creates an additional recreational trail easement.

We agree with Defendants-Appellees. The Trails Act, by its plain language, "prevents the operation of state laws that would otherwise come into effect upon abandonment—property laws that would 'result in extinguishment of easements for railroad purposes and reversion of rights of way to abutting landowners.'" *Caldwell v. United States*, 391 F.3d 1226, 1229 (Fed. Cir. 2004) (quoting *Rail Abandonments—Use of Rights-of-Way as Trails*, 2 I.C.C. 2d 591, 596 (1986)). "Section 8(d) provides that a railroad wishing to cease operations along a particular route may negotiate with a State, municipality, or private group that is prepared to assume financial and managerial responsibility for the right-of-way. If the parties reach agreement, the land may be transferred to the trail operator for interim trail use, subject to [STB]-imposed terms and conditions . . . ." *Preseault I*, 494 U.S. at 6–7 (footnote omitted); *see also* 16 U.S.C. § 1247(d); 49 C.F.R. § 1152.29 (2012). The STB will issue a NITU, and the railroad corridor is "railbanked." *See, e.g.*, 49 C.F.R. § 1152.29(d)(1)–(2) (2016); *Caldwell*, 391 F.3d at 1229.

The question of how "railbanking" affects the underlying property rights in a corridor turns on state law. To understand why, it is helpful to consider the Federal Circuit's rails-to-trails takings jurisprudence. In the years since the

Trails Act's enactment, the Court of Federal Claims has been inundated with Tucker Act claims alleging that the Trails Act's preclusion of state law caused a taking of their property interests, for which the landowners were entitled to just compensation under the Fifth Amendment. To decide these cases, that court has been required to determine what property interests were taken when each corridor was railbanked; only once the court determined *what* was taken could it determine *how much* (if any) compensation was due.

Consistently, the Federal Circuit has explained that "a Fifth Amendment taking occurs when, pursuant to the Trails Act, state law reversionary interests are effectively eliminated in connection with a conversion of a railroad right-of-way to trail use." *Caldwell*, 391 F.3d at 1228 (citing *Preseault v. United States*, 100 F.3d 1525, 1543 (Fed. Cir. 1996) (en banc) ("*Preseault II*")). "The Trails Act prevents a common law abandonment of the railroad right-of-way from being effected, thus precluding state law reversionary interests from vesting." *Jackson v. United States*, 135 Fed. Cl. 436, 443 (2017) (citing *Caldwell*, 391 F.3d at 1229). And, it is "state law [that] creates and defines the scope of the reversionary or other real property interests affected by the [STB's] actions pursuant to . . . 16 U.S.C. § 1247(d)." *Preseault I*, 494 U.S. at 20 (O'Connor, J., concurring); *see also, e.g.*, *Toews v. United States*, 376 F.3d 1371, 1375 (Fed. Cir. 2004) (determining scope of railroad easements under California law); *Preseault II*, 100 F.3d at 1542 (determining scope of railroad easements under Vermont law). Thus, to determine whether there has been a taking in a rails-to-trails case involving a railroad easement, a court must determine whether, as a matter of state law, the scope of the railroad easement was limited to railroad purposes or broad enough to encompass future use as a recreational trail. *See, e.g.*, *Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373

(Fed. Cir. 2009) (citing *Preseault II*, 100 F.3d at 1533). If the railroad possessed an easement limited to railroad purposes, such that the corridor's use as a recreational trail normally would trigger the easement's abandonment under state law, then the Trails Act deprived Plaintiffs-Appellants of their reversionary rights and caused a taking. *See, e.g.*, *Ladd v. United States*, 630 F.3d 1015, 1019 (Fed. Cir. 2010) (holding that a taking occurs in a rails-to-trails case "when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement"); *Jackson*, 135 Fed. Cl. at 444 ("If standard abandonment had occurred . . . , the railroad, as the owner of the servient estate, would not retain any property interest in the right-of-way, and that property interest would revert to the dominant landowner. Thus, the Trails Act, in preventing this reversion, effects a taking." (citation omitted)); *Balagna v. United States*, 135 Fed. Cl. 16, 22 (2017) ("If the railroad acquired an easement limited only to railroad purposes, . . . then the issuance of the NITU interferes with the plaintiff's state law property rights and triggers the application of the Takings Clause."). In essence, the Government, through the Trails Act, has taken the landowner's reversionary property right and created a new easement for trails use. *See Toews*, 376 F.3d at 1376 ("[I]f the Government uses . . . an existing railroad easement for purposes and in a manner not allowed by the terms of the grant of the easement, the Government has taken the landowner's property for the new use. The consent of the railroad to the new use does not change the equation—the railroad cannot give what it does not have."); *Preseault II*, 100 F.3d at 1550 ("The taking of possession of the lands . . . for use as a public trail was in effect a taking of a new easement for that new use, for which the landowners are entitled to compensation. . . . [It resulted in] a new

easement for the new use, constituting a physical taking of the right of exclusive possession . . . .").

Here then, to determine the impact of the Trails Act on Plaintiffs-Appellants' property rights, we must look to Washington law.  As noted, the parties agree that because no original deeds for the portions of the Corridor adjacent to which the Non-Hornish Plaintiffs-Appellants own land were put into evidence, the railroad easement was a prescriptive easement with regard to those portions of the Corridor. Under Washington law, a prescriptive easement is "established only to the extent necessary to accomplish the purpose for which the easement is claimed." *Yakima Valley Canal Co. v. Walker*, 455 P.2d 372, 374 (Wash. 1969). Thus, a prescriptive *railroad* easement exists "to the extent necessary" to operate a railroad.  Accordingly, Washington common law dictates that "a change in use from 'rails to trails'" will "constitute[] abandonment" of such easement. *Lawson v. State*, 730 P.2d 1308, 1313 (Wash. 1986).  And, upon that abandonment, in the ordinary case, "the right of way would automatically revert to the reversionary interest holders." *Id.*

However, this is not an ordinary case, because here, the Trails Act has stopped the reversion from occurring.  It has prevented abandonment of the railroad easement in the event of trail use—a use outside of those necessary for railroad purposes—and thereby preserved the original railroad easement.  However, this application of the Trails Act has, in effect, created a *new* easement for a new use—for recreational trail use.  The railroad and its successors in interest now have two easements:  (1) the easement for railroad purposes, which they never abandoned (because of the Trails Act) and therefore retain, and (2) the new

easement for recreational trail purposes.  *See Preseault II*, 100 F.3d at 1550.

Here, the railroad chose to convey its ownership interest in the Corridor to TLC by quitclaim deed.  TLC then initiated the railbanking process, the STB issued a NITU, and the Corridor was "railbanked."  At that point, TLC conveyed all of its ownership interests in the Corridor to King County through a duly recorded quitclaim deed.  For the reasons outlined above, this conveyed to King County *both* the railroad's original, unabandoned easement for railroad purposes and the new easement for recreational trail purposes that the Trails Act had created.  *See Trevarton v. South Dakota*, 817 F.3d 1081, 1087 (8th Cir. 2016) (holding that when railroad conveyed its railroad easement to the defendant through a quitclaim deed, the defendant also acquired the "new easement" created by the Trails Act).  Since there is no evidence that King County has subsequently used these easements in a manner inconsistent with their purposes (which could trigger abandonment under state law), we hold that King County possesses the railroad and recreational trail easement.[4]

---

[4]    Though this result may seem harsh, it is essential to note that [a] conveyance . . . under the Trails Act [does] not leave [the former reversionary interest holders] without a remedy . . . . Indeed, it [leaves] them with a variety of possible remedies— for example, a takings action seeking compensation because [the trail sponsor's] new easement diminished the property rights [the landowners] enjoyed when the right-of-way was limited to railroad uses; or a court action claiming that [the trail sponsor is] unlawfully managing the Trail as a matter of federal or state law; or a petition to the STB claiming that [the trail sponsor's] management of the Trail impairs restoration of the right-of-way to railroad use.  And of course [landowners] can negotiate with state officials to allow [them] reasonable access

## C.  The Centerline Presumption Does Not Apply

The Non-Hornish Plaintiffs-Appellants contend that notwithstanding King County's easement, they have standing because Washington's "centerline presumption" gives them a property right in the Corridor (i.e., a "direct, substantial interest").  We disagree.

Washington's "centerline presumption" was first recognized by the Washington Supreme Court in *Roeder Company v. Burlington Northern, Inc.*, 716 P.2d 855 (Wash. 1986).   There, the court first applied "the 'highway presumption' . . . to railroad rights of way," and held that, in general, "the conveyance of land which is bounded by a railroad right of way will give the grantee title to the center line of the right of way if the grantor owns so far, unless the grantor has expressly reserved the fee to the right of way, or the grantor's intention to not convey the fee is clear."  *Id.* at 861.  Thus, the court reasoned, when a "deed refers to the grantor's right of way as a boundary without clearly indicating that the side of the right of way is the boundary, it is presumed that the grantor intended to convey title to the center of the right of way."  *Id.*

> When, however, a deed refers to the right of way as a boundary but also gives a metes and bounds description of the abutting property, the presumption of abutting landowners taking to the center of the right of way is rebutted.  A metes and bounds description in

and use of the right-of-way for their ranch operations, as they presumably negotiated with railroad operators in the past.

*Trevarton*, 817 F.3d at 1087.

a deed to property that abuts a right of way is
evidence of the grantor's intent to withhold
any interest in the abutting right of way, and
such a description rebuts the presumption
that the grantee takes title to the center of the
right of way.

*Id.* at 861–62.

Additionally, the *Roeder* court clarified that the
centerline presumption is of limited applicability. An
abutting landowner is not automatically entitled to the
centerline presumption. *Id.* at 862 ("A property owner
receives no interest in a railroad right of way simply through
ownership of abutting land."). Thus, an adjoining landowner
may not invoke the centerline presumption if he presents "no
evidence of having received his or her property from the
owner of the right of way." *Id.* "Without evidence showing
that the owner of abutting property received that property
from the fee owner of the right of way property, the railroad
presumption is inapplicable." *Id.*

The district court found that the centerline presumption
did not apply here. First, the court held that all of the Non-
Hornish Plaintiffs-Appellants' deeds "contain[ed] metes and
bounds descriptions which use the right of way as a
boundary line." Second, the court held that the Non-Hornish
Plaintiffs-Appellants had failed to provide the requisite
evidence of their interest, because they "[did] not succeed in
establishing chain of title." Their property interests derived
from a common grantor, Middleton, in whose probate the
Corridor was specifically excluded. The district court
therefore concluded that the centerline presumption was
inapplicable, in light of "the Court's rulings on the other
issues presented [that] establish the parties' respective

rights," and also not a determinative, material dispute that could preclude summary judgment.

We agree.  The Non-Hornish Plaintiffs-Appellants cannot invoke the centerline presumption because (1) the grantor, Middleton "expressly reserved the fee to the right of way," *Roeder*, 716 P.2d at 861, and (2) the Non-Hornish Plaintiffs-Appellants deeds and chains of title utilize the railway as a boundary, as the district court determined.  The centerline presumption does not afford the Non-Hornish Plaintiffs-Appellants any property interest in the Corridor. Without such an interest, these Plaintiffs-Appellants lack standing to bring their declaratory judgment claims.  The district court's denial of summary judgment to Plaintiffs-Appellants and dismissal of the AC on this basis are affirmed.

## II. The District Court Properly Granted Summary Judgment to and Quieted Title in King County

### A. King County Possesses the Railroad Easement and Recreational Easement

As described above, King County acquired its property interests through a series of conveyances undertaken pursuant to the Trails Act.  When TLC conveyed all of its ownership interests in the Corridor to King County through a duly recorded quitclaim deed, TLC conveyed to King County *both* the railroad's original, unabandoned easement for railroad purposes and the new easement for recreational trail purposes that the Trails Act had created. *See Trevarton*, 817 F.3d at 1087; *Preseault II*, 100 F.3d at 1550.  As there is no evidence that King County has subsequently used these easements in a manner inconsistent with their purposes (which could trigger abandonment under state law), we hold that King County possesses the railroad and recreational trail

easement.    The railroad easement encompasses the full extent of incidental uses that may be authorized under Washington law.[5]   *See Wash. Sec. & Inv. Corp. v. Horse Heaven Heights, Inc.*, 130 P.3d 880, 886 (Wash. Ct. App. 2006); *Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Lines Ass'n*, 91 P.3d 104, 115 (Wash. Ct. App. 2004), *aff'd in part, rev'd in part on other grounds*, 126 P.3d 16 (Wash. 2006).

### B. The Easement's Width Adjacent to the Non-Hornish Plaintiffs-Appellants' Properties Is 100 Feet

Plaintiffs-Appellants claim that the railroad "utilized a width of approximately 12 feet for their actual railroad operations for over 100 years from 1888 until 1998." Defendants-Appellees dispute this, arguing that the Corridor is 100 feet wide, except where it is fifty feet wide next to the Morel Plaintiffs-Appellants' property and is approximately seventy-five feet wide next to the Menezes and Vanderwende Plaintiffs-Appellants' properties. Defendants-Appellees also observe that "[a]t various times in this litigation, Appellants have claimed the Railroad actually needed a width 'between 12 feet and 20 feet,' "no greater than 18 feet," fourteen feet, ('7 feet from center line' on both sides 'of the tracks'), and 'approximately 12 feet.'"

In support of their current 12-foot-width argument, Plaintiffs-Appellants primarily rely on the declaration of

---

[5] Because the identity of such permitted incidental uses has not been disputed in this case, we do not opine as to what such uses might be.  *See Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1164 n.4 (9th Cir. 2014) (holding that where an issue is mentioned without legal argument, the issue is neither specifically nor distinctly argued and thus not subject to review).

Eugene and Elizabeth Morel (the Morel Declaration).  The Morels assert that at their property, which is "located along" and "bisected" by a portion of the Corridor, the Corridor has a width of 10 feet.  The original house on the property was built in the 1920s and '30s, and "was more than 50% inside the [right-of-way] width claimed by King County."  The Morels claim that they have paid taxes on the parts of the home and property that fall within the land claimed by King County.  An access driveway "was and is still today" within that right-of-way.  The Morels improved an area on the east side of the track, "about 7 feet from [the] center line of the tracks," which they used to park cars.  To access their house, they would cross the tracks and walk down stairs to it.  The Morels also improved the land by adding "privacy trees," other landscaping, irrigation, patios, and child swing sets.  No rail operator ever asked the Morels to stop or limit these uses of the land.

Then, in 1996, the Morels obtained a quitclaim deed from BNSF granting them "clear title to the outside 25 feet on both the east and west sides of the [right-of-way]."  This allowed the Morels to replace the original house with a new house, the construction of which finished in 2001.  The Morels claim that "driveways, walkways, landscaping and other improvements were installed during construction" that are "clearly on land that King County claims they own via prescriptive easement."  The Morels also assert that there is an "8 foot diameter boulder, estimated to weigh about 6 tons" that sits on the lot owned by the Neighbors Plaintiffs-Appellants.  One of the Morels played on the rock as a child, in the 1950s.  The Morels assert that this rock proves the right-of-way is no more than 12 feet in width because the "rock is just over 6 feet from the centerline of the [right-of-way] corridor" and the railroad has never removed it.

Plaintiffs-Appellants also rely on the declaration of John Rall (the Rall Declaration), a private consultant with a bachelor's degree in civil engineering and a "Professional Land Surveying License" from the state of Georgia. Rall indicates that he has reviewed the chains of title relating to the Plaintiffs-Appellants' chains of title, and determined that they evidence that

> [1] [n]o deed in the chains of title expressly reserved the fee portion underlying the Railroad Right-of-way unto any predecessor grantor; [2] [e]ach grantor . . . granted all interest that they owned, including their interest in the railroad right-of-way; . . . and [3] [e]ach of the current [Plaintiffs-Appellants] acquired their interests in the former railroad right-of-way from their predecessor in interests and are the current owners of the underlying fee in the current easement held by King County for hiking and biking purposes with the potential future reactivation of a railroad.

In support of their claim that the Corridor has a 100-foot width, Defendants-Appellees introduced "[o]fficial agency records from the Interstate Commerce Commission ('ICC'), known as the 1917 Val Maps." The Val Maps were drawn pursuant to the 1913 Valuation Act, which required the ICC "to make an inventory which shall list the property of every common carrier subject to the provisions of this Act in detail, and show the value thereof as hereinafter provided, and shall classify the physical property, as nearly as practicable." Pub. L. No. 62-400, § 19(a), 37 Stat. 701, 701 (1913) (former 49 U.S.C. § 10781). During this inventory, engineers devised the Val Maps to document "the land owned by a

railroad and how it was acquired, the land adjacent to railroad property, and the financial history of the railroad from its earliest operations to the date of basic valuation." Defendants-Appellees contend that the maps prove that the width of the relevant portions of the Corridor has long been 100 feet. First, the Maps indicate that the Railroad originally acquired 4.71 acres of land in the 2,050-foot-long segment adjacent to the Neighbors, Morel, and Menezes and Vanderwende Plaintiffs-Appellants' properties, Parcel 6, by way of adverse possession. Second, the Maps indicate that the segment adjacent to the Lake Sammamish 4257 LLC and the Moore Plaintiffs-Appellants' property, Parcel 13, is 3.29 acres and 1,434.4 feet long. Defendants-Appellees claim these measurements confirm the Corridor's 100-foot width.

Defendants-Appellees have also introduced certain of the King County Assessor's records. These records document a change in "the area owned by Mr. Middleton in 1891 and later years," which Defendants-Appellees argue "confirms the creation of a one hundred feet Corridor in Lot 2 of Section 7, Township 24 North, Range Six East of the Willamette Meridian, which eventually became the source of the parcels owned by the Neighbors, Morel, and Menezes and Vanderwende [Plaintiffs-Appellants]." Defendants-Appellees claim that "[t]he Assessor Rolls confirm the Railroad also acquired a one hundred foot Corridor in Lot 3 of Section 17, which became the source of the property owned by Lake Sammamish 4257 LLC and the Moore [Plaintiffs-Appellants]." Additionally, the King County Assessor's maps exclude the one hundred foot Corridor from Appellants' properties, consistent with tax assessments dating back to 1895. Notably, Plaintiffs-Appellants offered no proof that they have ever paid property taxes within the Corridor.

Additionally, Defendants-Appellees argue that the actions of Plaintiffs-Appellants and their predecessors-in-interest comport with an understanding of the 100-foot width. For example, the Morel Plaintiffs-Appellants acquired their property from Eugene Morel's parents, who acknowledged that the Corridor was one hundred feet wide when they purchased a "portion of [BNSF's] 100.0 foot wide Snoqualmie Branch Line right of way" from the Railroad on May 23, 1996, and left the railroad with the 50 feet it still has today. And the predecessor of the Menezes and Vanderwende Plaintiffs-Appellants, Lynn Goldsmith, filed an adverse possession lawsuit against the Railroad, disputing the Railroad's "claim[] that the right of way is 100 ft. in width – 50 ft. on each side of its centerline." Goldsmith settled her claims in exchange for a narrow strip of land from BNSF, implicitly acknowledging that the remainder of the Corridor—roughly seventy-five feet wide—belonged to BNSF (and now King County). Such attempts to buy land are inconsistent with a belief in one's right of possession. *Cf. City of Port Townsend v. Lewis*, 75 P. 982, 983 (Wash. 1904) (finding that purported possessors' "contesting with the officers of the state and municipality their claim of a preference right to purchase the[] very lands" they claimed to possess was conduct "wholly inconsistent with the idea of an adverse possession"); *Jensen v. Compton*, 131 Wash. App. 1064, 2006 WL 616052, at \*3 (2006) (holding that defendant's offer to purchase undermined his adverse possession claim).

Finally, Defendants-Appellees provide evidence that a 100-foot-width is necessary for railroad operations. For example, Mike Nuorala, a longtime engineer for BNSF, stated in his declaration that the full width of the right of way is necessary as a "safety buffer to ensure minimum setbacks between freight trains and residential development, to

prevent nearby construction and development activities that could undermine the stability of the steep slopes above and below the tracks, and to provide access for maintenance activities, such as tie replacement, that require significant clearance on one or both sides of the track."

Lining this evidence up alongside Plaintiffs-Appellants', it is clear that most of Defendants-Appellees' evidence is unrebutted. The Rall Declaration is inadmissible, because it offers only Rall's interpretation of the relevant deeds, and "[r]esolving doubtful questions of law is the distinct and exclusive province of the trial judge." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (quoting *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993)); *see also Washington v. Maricopa County*, 143 F.2d 871, 872 (9th Cir. 1944) (holding that affidavits containing "statements of legal conclusions . . . should have been disregarded" in resolving summary judgment motion). And, the Morel Declaration, at most, creates a genuine issue of fact regarding the *historic* width of the Corridor adjacent to only the Morels' property with its statement that the Morel family previously had a home inside the claimed Corridor. However this dispute is not material; the current width of the Corridor adjacent to the Morels' property is undisputed because of the Morel family's 1996 purchase of land from the railroad. Because Plaintiffs-Appellants have not introduced any admissible evidence to support their claimed 12-foot width, and Defendants-Appellees have introduced considerable evidence supporting their claimed 100-foot width, there is no genuine dispute of material fact with regard to the width of the Corridor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (holding that summary judgment standard is met where the evidence is "so one-sided that one party must prevail as a matter of law"). The

width of the Corridor is 100 feet, except where fifty feet wide next to the Morel Plaintiffs-Appellants' property and approximately seventy-five feet wide next to the Menezes and Vanderwende Plaintiffs-Appellants' properties.[6]

## C. Plaintiffs-Appellants' Motion to Supplement the Record

Also pending in this case is Plaintiffs-Appellants' motion to supplement the record on appeal with certain evidence that was not before the district court. (Dkt. No. 57). Specifically, Plaintiffs-Appellants seek to add certain evidence and testimony introduced by Plaintiffs-Appellants in a similar case, *Neighbors v. King County*, which they contend contradicts Defendants-Appellees' claim that the corridor at issue here had a consistent width of 100 feet and supports Plaintiffs-Appellants' argument that the width is much less.

Defendants-Appellees oppose this motion, (Dkt. No. 61), which they point out was not made until nearly 18 months after the district court proceedings had concluded. Defendants-Appellees contend that Plaintiffs-Appellants made the strategic decision to argue below that Defendants-Appellees' payment of taxes and fees was irrelevant, and that Plaintiffs-Appellants should now be held to that choice on appeal. Defendants-Appellees also note that the evidence Plaintiffs-Appellants seek to introduce includes declarations written by Plaintiffs-Appellants themselves, and that Plaintiffs-Appellants have offered no

---

[6] Because we resolve the case on these grounds we do not reach the district court's holding in the alternative that King County acquired property rights in the Corridor pursuant to Washington Revised Code section 7.28.070.

explanation as to why this evidence was not available at the time of the summary judgment proceedings below.  Finally, Defendants-Appellees argue that the submitted materials are not the proper subject for judicial notice, and that there has been no showing of extraordinary circumstances.

We agree with Defendants-Appellees.  Plaintiffs-Appellants had a full opportunity to acquire these records during discovery, and simply failed to do so.  Plaintiffs-Appellants have not offered any explanation for their failure to undertake discovery relating to King County's payment of taxes and to procure and produce their own property tax records in response to King County's discovery.  Indeed, below Plaintiffs-Appellants explained only that they were not obtaining this discovery because they believed it irrelevant.  It is only now, after the district court has disagreed with that belief and *credited* Defendants-Appellees' argument, that Plaintiffs-Appellants have felt compelled to act.  And yet even now, Plaintiffs-Appellants have not procured this discovery on their own.  They only became aware of it when it was filed fortuitously in a separate case.

On appeal of summary judgment, courts generally consider only the record that was before the district court. *United States v. W.R. Grace*, 504 F.3d 745, 766 (9th Cir. 2007).  This court will make "exceptions to this general rule in three situations: (1) to 'correct inadvertent omissions from the record,' (2) to 'take judicial notice,' and (3) to 'exercise inherent authority . . . in extraordinary cases.'"  *Id.* (alteration in original) (quoting *Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003)).

Neither of the first two exceptions could apply here. Plaintiffs-Appellants have made no argument that these documents were omitted by mistake or by accident. Rather, the record makes clear that they were omitted for a tactical reason—because Plaintiffs-Appellants had concluded they were irrelevant. Additionally, the contents of the records are not a matter of which the court can take judicial notice. Even if the records are filed on the public docket of the *Neighbors* case, we can take judicial notice only of the *filing* of the documents, and not of the truth of the documents' contents. *See, e.g.*, *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006); *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).

Thus, only the third exception remains for our consideration. However, Plaintiffs-Appellants have not explained in their moving papers or at oral argument what extraordinary circumstances prevented their timely introduction of such evidence as *their own* declarations in this case. Moreover, there seems to be nothing extraordinary about Plaintiffs-Appellants' situation. Plaintiffs-Appellants were well aware that the width of the Corridor was at issue at summary judgment, and that it was their burden to introduce evidence supporting their claim that the width was no greater than 12 feet. Plaintiffs-Appellants believed the Morel and Rall Declarations were sufficient, and declined to obtain the additional evidence that was available to them. We see no reason why now they should be freed from the consequences of that strategic decision. Plaintiffs-Appellants' motion to supplement the record is denied.

## CONCLUSION

For the foregoing reasons, we affirm the district court's denial of summary judgment to Plaintiffs-Appellants, dismissal of the AC, and grant of summary judgment and

quiet title to King County.    We also deny Plaintiffs-Appellants' motion to supplement the record.

**AFFIRMED.**